AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the Central District of California

| United States of America | |
|---|---|
| v. | Case No. 2:24-mj-05936-DUTY |
| WEI CHEN CHANG and CHAO HSIANG WANG, Defendants. | |

FILED
CLERK, U.S. DISTRICT COURT
9/28/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about September 26, 2024, in the county of Los Angeles in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) | Possession with Intent to Distribute Methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Robert Watson, SA Homeland Security Investigations
*Complainant's signature*

Robert Watson, SA Homeland Security Investigations
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone. Date: **9/28/2024**

*Judge's signature*

City and state: Los Angeles, California

Hon. Charles F. Eick, U.S. Magistrate Judge
*Printed name and title*

AUSA: Lisa Lindhorst (x6772)

**AFFIDAVIT**

I, Robert Watson, being duly sworn, declare and state as follows:

### I.   PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint against Chao Hsiang WANG ("WANG") and Wei Chen CHANG ("CHANG") (collectively "TARGETS") for violating 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute Methamphetamine.

2.   This affidavit is also made in support of an application for a warrant to search the following three cellphones (collectively, SUBJECT DEVICES), which are currently in the custody of Homeland Security Investigations ("HSI") in El Segundo, California, each of which are described more fully in attachment A: (1) a white/pink iPhone seized from WANG's personal property ("DEVICE-2"); (2) a silver iPhone 14 seized from WANG's personal belongings, and (3) a white iPhone obtained from CHANG's belongings ("DEVICE-3").

3.   The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy to possess with the intent to distribute controlled substances), 21 U.S.C. § 953(a) (unlawful exportation of controlled substances), 21 U.S.C. § 960 (knowing exportation of a controlled substance), and 18 U.S.C. § 554 (knowing exportation of any merchandise

contrary to any law) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.   BACKGROUND OF AFFIANT

5. I am a Special Agent ("SA") with HSI and have been since January 2024. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(c), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. In the course of my work, I have conducted physical surveillance, executed arrest warrants, and reviewed electronic records.

6. I have a bachelor's degree in Criminal Justice from Northern Arizona University and master's degree in Applied Criminology with an emphasis in Transnational Crime from Northern Arizona University. I was a local law enforcement

officer in the City of Fullerton, CA for approximately six years. During that time, I worked as patrol officer, student resource officer, worked as a detective, and was a field training officer. I have completed approximately 500 hours worth of instruction from the Federal Law Enforcement Training Center, resulting in a certificate of completion from the Criminal Investigator Training Program ("CITP"). I have also completed approximately 500 hours of HSI related instruction from the Federal Law Enforcement Training Center, resulting in a certificate of completion from the Homeland Security Investigations Special Agent Training program.

### III.  SUMMARY OF PROBABLE CAUSE

7.   The TARGETS are a young couple from Taiwan who travelled together to Los Angeles on September 18, 2024. On September 26, 2024, the TARGETS attempted to travel together from Los Angeles International Airport ("LAX") to Sydney, Australia on United Airlines Flight UA-839, which was scheduled to depart LAX at approximately 10:40 p.m.

8.   Both TARGETS checked their suitcases onto the international flight destined for Australia. During security screening of those suitcases after they were checked in, Officers from Customs and Border Protection ("CBP") noticed abnormal packaging in both TARGETS' suitcases on x-ray images and pulled the suitcases for inspection. Officers opened both

suitcases and found a total of seven large boxes labeled "Organic Wild Blueberry powder" and "American Ginseng powder." WANG's bag contained three such boxes and CHANG's contained four.

9.  Officers opened One of the boxes from each of the two suitcases and saw multiple identical, commercially packaged plastic packages labeled "Ginseng" within both boxes. Officers opened one of the packets from each opened box and saw that they contained a white crystalline substance that later field-tested positive for methamphetamine. The boxes in WANG's suitcase contained 86 plastic packets which weighed (including packaging) approximately 7.8 kilograms. The boxes in CHANG's suitcase contained 75 plastic packets which weighed inclusive of packaging approximately 9.5 kilograms.

10. After finding the suspected methamphetamine, officers located the TARGETS as they were walking towards their gate and asked them if the suitcases they had just checked into the flight belonged to them. Both TARGETS speak only Chinese and all questioning and correspondence was handled through CBP Officer Liu who translated for other officers and agents. Both TARGETS stated that they owned and had packed their respective suitcase. Both suitcases also contained personal items such as clothing consistent with each TARGETS' size, gender and appearance.

11. During a subsequent Mirandized interview, WANG stated that his friend, "Y.L." paid for both TARGETS to take "mushroom powder" via airplane to Australia, and that this friend paid for both TARGETS' flight from Taiwan to Los Angeles and from Los Angeles to Sydney, and for their hotel in Los Angeles. WANG stated that an associate of Y.L. told WANG that he would pay WANG 100,000 Taiwanese dollars after the delivery was made (approximately $3,165 in U.S. currency).

12. WANG had DEVICE-1 and DEVICE-2 within his personal property and CHANG had DEVICE-3 in her personal property. The TARGETS confirmed these devices belonged to them and they both voluntarily provided the passcodes for each.

### IV.  STATEMENT OF PROBABLE CAUSE

Based on my involvement in this investigation, my conversations with other law enforcement officials involved in this investigation, and my review of reports and records connected to this investigation, I am aware of the following.

### A. CPB Officers Find Suspected Methamphetamine inside TARGETS' Checked Baggage

13. CBP Officers informed me that on September 26, 2024, WANG and CHANG had checked one suitcase each onto their international flight which was scheduled to depart from LAX and land in Sydney, Australia. Those two suitcases were screened as part of CBP's international flight screening protocols, which

5

are based in part on current narcotics smuggling trends from the United States to Australia.

    14. The TARGETS' checked luggage was scanned through a Mobile Rapiscan (x-ray) and the officers monitoring the Mobile Rapiscan noticed what they described as anomalies in both suitcases due to the way in which the crystalline substance (found within the packets mentioned below) appeared on the screen. The officers pulled both luggage for inspection. The inspection revealed three boxes in CHANG's and WANG's suitcases that were labeled as Organic Wild Blueberry powder and American Ginseng powder, and four boxes in CHANG's suitcase with the same label, as depicted below:




15.  Officers opened one box from each suitcase, which revealed dozens of identical, commercially packaged plastic bags labeled "Ginseng."




16.  Officers opened just one of the plastic bags from each suitcase and saw that both contained a white crystalline substance.

B. **Substance Seized from TARGETS' Suitcases Tests Presumptively Positive for Methamphetamine and Weighs A Combined Total of Approximately 17 kilograms**

17.  CBP Officers later conducted a presumptive test of the white crystalline substance from the two plastic packets that




had been opened (one from each suitcase) and both yielded positive results for methamphetamine, as shown below.

18. WANG's suitcase contained 86 plastic packets which weighed (including packaging) approximately 7.8 kilograms. The boxes in CHANG's suitcase contained 75 plastic packets which weighed inclusive of packaging approximately 9.5 kilograms. The combined total of the packets from both suitcases that were suspected to contain methamphetamine amounted to (with packaging included) approximately 17 kilograms.

**C. TARGETS Admit to knowing the Boxes were Inside their Bags and Admit to Packing Their Own Bags**

19. After finding the suspected methamphetamine inside the TARGETS' suitcases, CPB officers proceeded to boarding gate 76-A to intercept WANG and CHANG before they could board. The TARGETS were together at the gate and both were identified at approximately 10:21 p.m. as they were attempting to board the flight. The TARGETS were then escorted back to CBP's inspection area with all their belongings.

20. While at the inspection area, officers obtained bag tags from both TARGETS and matched them to their respective suitcases described above. Officers also asked both TARGETS, through Chinese translation, whether these suitcases belonged to them. Both TARGETS admitted to owning and personally packing their respective suitcase. Officers also advised me that within each suitcase, the boxes containing suspected methamphetamine were found next to personal items and clothing that appeared to

match the size, gender, and appearance of each respective TARGET, which further confirmed that they each packed their respective suitcase.

21. At approximately 12:30 a.m. on September 27, 2024, I responded to the scene and inspected the contents of both suitcases. I also found both TARGETS' passports within their personal belongings, which confirmed are both Taiwanese citizens. I also took custody of the SUBJECT DEVICES.

**D. WANG Admits in a Mirandized Interview that he was Being Paid to Transport "Mushroom Powder" to Australia**

22. With the assistance of a Chinese interpreter, I attempted to interview both TARGETS separately in U.S. Customs and Border Protection's main secondary inspection area. CHANG advised she wanted an attorney and the interview concluded.

23. WANG, however, waived his rights and agreed to talk. The following is a summary of the interview and does not purport to set forth all facts or knowledge involved in the interview. WANG stated he does not have any family or friends in the U.S. He explained that he and CHANG arrived in the U.S. on September 19, 2024, to pick up "mushroom powder" from an associate of his friend Y.L. and to transport that mushroom powder to Australia. Once the transport was complete, he would be paid approximately 100,000 Taiwanese dollars (which I believe to be approximately $3,165 USD). WANG stated that he had been friends with Y.L. for approximately 8-9 years and that Y.L. paid for his and CHANG's flights and hotel.

24. When asked specifically about the "mushroom powder," WANG explained that at 9:30 a.m. on September 26, 2024 (the day of their flight to Australia) a friend of Y.L.'s coordinated the pickup with WANG via Telegram. That friend told WANG that WANG would be collecting the "mushroom powder" from someone at a restaurant near the Hilton hotel in San Gabriel, which is where WANG was staying. WANG did as instructed. He met with an Asian female outside of a restaurant, which was near a "Hawaii Supermarket." WANG said the two of them said nothing other than "hi," and then the female gave WANG seven boxes on a dolly and promptly left. WANG walked the boxes back to his hotel with the dolly then confirmed with Y.L.'s friend that he had received them.

25. WANG advised he had never flown to another country to pick up packages and take other places before. WANG also stated that CHANG knew they were flying to the U.S. to pick up "Mushroom powder" and that she trusted Y.L. When asked if WANG thought the boxes were actually "mushroom powder," WANG said he realizes now that that is not the case.

### V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

26. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug

traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

      b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

      c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

      d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their

digital devices, including in the form of calendar entries and location data.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

27. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of

---

[1] As used herein, the term "digital device" includes SUBJECT DEVICES and any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

   c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

   e. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to

search a digital device for many reasons, including the following:

      f.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

      g.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

28.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//
//
//
//
//
//
//
//

## VII. CONCLUSION

29. For all of the reasons described above, I submit that there is probable cause to believe that CHANG and WANG committed a violation of 21 U.S.C. §§ 841(a)(1), Possession with Intent to Distribute a Controlled Substance. I further submit that there is probable cause to believe that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant
in accordance with the
requirements of Fed. R. Crim.
P. 4.1 by telephone on this
28th day of September, 2024.

_____
HONORABLE CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE